**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| MAXWELL S. PFEIFER and | : | Case No. 12-13852 (ALG) |
| MYRNA J. PFEIFER, | : | |
| | : | |
| Debtors. | : | |

------------------------------------------------------------ x
| | | |
|---|---|---|
| MAXWELL S. PFEIFER , | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | Adv. Pro. No. 13-1348 (ALG) |
| | : | |
| DENIS F. CRONIN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------------ x

## MEMORANDUM OF DECISION AND ORDER

A P P E A R A N C E S:

FENSTERSTOCK & PARTNERS LLP
*Counsel to Plaintiff*
  By:   Blair C. Fensterstock
          Eugene D. Kublanovsky
100 Broadway, 8th Floor
New York, New York 10005

DRINKER, BIDDLE & REATH LLP
*Counsel to Defendants Denis F. Cronin, et al.*
  By:   Frank F. Velocci
          Charles A. Reid III
          Brian P. Morgan
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714

MORTON L. GINSBERG
*Pro Se Defendant*

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

**Introduction**

Defendants have moved to dismiss on statute of limitations grounds the above-captioned adversary proceeding asserting claims of breach of fiduciary duty, conversion, and breach of contract. For the reasons set forth below, the motion to dismiss is granted in part and otherwise converted to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 12(d), made applicable by Bankruptcy Rule 7012.

**Facts**

The following facts are taken from the Complaint and are assumed to be true for the purposes of the motion to dismiss.

In August 1981, Plaintiff Maxwell Pfeifer ("Pfeifer") and the individual defendants formed 9000 Centre Associates L.P. (the "Partnership"), also a defendant, "to purchase, operate, and ultimately sell a 40,000 square foot office building in Kendall, Florida" (the "Property"). Complaint ("Compl.") at ¶ 12. The investors were offered an opportunity to purchase units in the Partnership (the "Units") for $75,000, with each of the ten available units representing a 9.9% limited partner interest. *Id*. at ¶¶ 18, 19. The remaining one percent interest was held by the General Partner, Defendant Morton Ginsberg. *Id*. Pfeifer purchased three Units for $225,000, which represented a 29.7% interest in the Partnership. *Id*. at ¶ 20. The individual Defendants purchased all of the other Units other than the nominal interest held by Ginsberg. *Id*. at ¶ 18.

The Partnership purchased the Property from Lindcrest Properties, Inc. ("Lindcrest"), which financed the purchase through a wrap note ("the Note") and a mortgage (the "Original Mortgage"). *Id*. at ¶ 17. Lindcrest subsequently assigned the Note and Original Mortgage to Defendant Ginsberg; the Complaint does not disclose the consideration paid. *Id*. Eventually,

Ginsberg divided the Note and Mortgage into Senior and Junior tranches. *Id.* at ¶ 25.[1] By 1996, Ginsberg had used the Junior Note as collateral and one of his creditors had foreclosed and sold it to a company named 9000 Centre Property Corp. ("Property Corp."). *Id.* at ¶ 26, 27. Defendant Denis Cronin ("Cronin"), an original investor in the Property along with Pfeifer, was a principal of Property Corp., which was created by his brother, John Cronin. *Id.* at ¶ 27.

In 1999 Ginsberg also sold the Senior Note and Mortgage, which he had retained, to Property Corp., and the Partnership Agreement was amended to replace Ginsberg as General Partner with 9000 Centre Management Corp. *Id.* at ¶ 22. Cronin authorized a $25,000 payment to Ginsberg to effectuate the deal. *Id.* at ¶ 23.[2]

In a series of memoranda to the Limited Partners from late 1997 to early 1999, Cronin proposed a plan to refinance the First and Second Mortgages. *Id.* at ¶ 33. The proposed plan called for the Partnership to obtain a new mortgage in the amount of $2.175 million from Aries Capital, a Chicago mortgage broker. *Id.* at ¶ 34. The Partnership would then use the proceeds of the Aries Capital mortgage to purchase the First Mortgage from Jefferson Pilot Life Insurance

---

[1] The Complaint describes these transactions in much greater detail. On April 6, 1992, Ginsberg divided the Note into a $600,000 Senior Wrap Note (the "Senior Note") and a $700,000 Junior Wrap Note (the "Junior Note" and, together with the Senior Note, the "Notes"). *Id.* at ¶ 25. At some point thereafter, Ginsberg used the Junior Note as collateral for obligations he apparently owed to Trust Company of New Jersey ("TCNJ"), *see* June 19, 2013 Certification of Denis F. Cronin, Docket No. 5, at Exh. A, and by 1996, TCNJ had foreclosed on the Junior Note and sold it for $75,000 to 9000 Centre Property Corp. ("Property Corp."). The record contains some discrepancies regarding these transactions. While the Complaint refers to the Senior and Junior Notes, the motion to dismiss and Pfeifer's response to that motion refer to Senior and Junior Mortgages. Likewise, the motion to dismiss and the memoranda attached thereto assert that TCNJ foreclosed on the Senior Mortgage rather than the Junior Note, with Ginsberg retaining the Junior Mortgage. These discrepancies are immaterial to the issues herein.

[2] The Junior Note was acquired by Property Corp. first. Thereafter, in October of 1998, Ginsberg exchanged his interest in the Senior Note for $75,000 in cash and a 5% limited partnership interest in the Partnership with a minimum priority cash distribution of $7,500 per year. *Id.* at ¶ 28. The motion to dismiss and the memoranda attached thereto assert that Ginsberg exchanged his interest in the Junior Mortgage rather than the Senior Note. According to the memoranda provided by Defendants, Cronin believed that a refinancing could not occur unless Ginsberg agreed to subordinate the Junior Mortgage. In order to effectuate these transactions Ginsberg received certain rights to partnership distributions. The Complaint alleges that Ginsberg received $75,000 in distributions from 2000 to 2012 and $273,851 in consulting fees from 1999 to 2003. *Id.* at ¶ 64. Pfeifer did not consent to any of these transactions. *Id.* at ¶ 29.

3

Company and the Second Mortgage from Entin Associates. *Id*. at ¶ 35.[3] Additionally, the Partnership would reimburse Property Corp. for its purchase of the two Notes and pay Cronin $100,000 in legal fees. *Id*. In all, the Partnership needed $760,000 to close the refinancing and pay Cronin. *Id*. at ¶ 36. The Partners (through Property Corp.) would then own (or at least control) the outstanding mortgages and Notes. *Id*.

The Complaint alleges Cronin proposed that the Limited Partners make a "capital contribution" of $55,000 per unit, or $550,000 total, in order to effectuate the refinancing. *Id*. at ¶ 37. The remaining difference of $210,000 would be financed by an interest-bearing loan from Cronin, to be paid on a priority basis from the Property's future cash flow after operating expenses and debt service. *Id*. The Limited Partners other than Pfeifer chose to invest in the refinancing. *Id*. at ¶ 42. On January 29, 1999, the Partnership issued a 10% Promissory Note for $550,000 to Property Corp. pursuant to which the Partnership promised to repay the Limited Partners who participated in the refinancing. *Id*. at ¶ 49. Pfeifer declined to participate in the refinancing and did not make any additional investments in the Partnership or the Property. *Id*. at ¶ 41. There is no dispute that as a result of the transactions detailed above, the Limited Partners other than Pfeifer, through Property Corp., which they controlled, refinanced the mortgages with new lenders, and the Partnership became obligated on the new mortgages and to Property Corp. for at least $550,000.

---

[3] Ginsberg had divided the Original Mortgage into a First Mortgage (the "First Mortgage") and a Second Mortgage (the "Second Mortgage"). *Id.* at ¶ 30. The First Mortgage, in the amount of $15,000, was held by Jefferson Pilot Life Insurance Company ("Pilot Life"). *Id.* at ¶ 30. The motion to dismiss asserts that Pilot Life Insurance Company originally held the First Mortgage in the principal amount of $250,000, that the amount owing in 1999 was $15,000, and that Pilot Life Insurance Company and Jefferson Standard Life Insurance Company merged in 1987 to form Jefferson Pilot Life Insurance Company. The Second Mortgage was transferred to Entin Associates ("Entin"), which valued it at $2.9 million. *Id.* at ¶ 31. The record does not clearly show who transferred the Second Mortgage to Entin, but it appears that Ginsberg did so. The memoranda provided with the motion to dismiss refer to this entity as Entin Co. rather than Entin Associates.

According to correspondence provided by the Defendants, in 2005 the Partnership received an offer for the Property, and Cronin informed Pfeifer and the other Limited Partners that the sales proceeds would be insufficient for any payment to be made to the limited partners after satisfaction of the existing mortgages. According to Defendants, they informed Pfeifer that his partnership interest had no value whatsoever.[4] *See* June 19, 2013 Certification of Denis F. Cronin, Docket No. 5, at Exh. E (letter dated March 30, 2005). In response, Pfeifer requested various documents and information relating to the 1999 transactions, the Property, and the proposed sale, which were allegedly provided. *Id.* at Exhs. E, G, H, I, J, K, L, M, N, O, P. Pfeifer's accountant apparently reviewed the documents and allegedly determined that Pfeifer was improperly excluded from the transactions, and Pfeifer wrote Cronin, "My suggestion is that there be an equitable adjustment of interests to deal with my claims." *Id.* at Exh. L. Further, according to this correspondence, Pfeifer was informed by a June 24, 2005 letter that the Partnership had not made any distributions on account of Limited Partner interests between 1999 and 2005, but that it had made payments to (i) the other Limited Partners on account of their interests in the debt, (ii) to Ginsberg pursuant to his agreements with the Partnership, and (iii) to Cronin on account of his loan of $210,000 in connection with the 1999 refinancing. After receiving this letter, Pfeifer's attorney appears to have sent Cronin a letter on June 29, 2005 alleging that the refinancing breached the Partnership agreement as well as fiduciary duties owed to Pfeifer. *Id.* at Exh. O. Cronin responded via a letter dated June 30, 2005, and asserted— among other things—that the Mortgages and refinancing were valid. *Id.* at Exh. P.

In any event, the Complaint does not contain any allegations regarding the foregoing communications, but it does allege that in October 2012, the Property was sold for $12.5 million

---

[4] As explained below, the Court is not relying on these documents for the purposes of this motion, but will convert the Defendants' motion into one for summary judgment.

to Baptist Hospital. Compl., at ¶ 53. Defendants allegedly did not notify Pfeifer about the sale until several weeks after it had closed.[5] *Id*. at ¶¶ 54, 55, 59. Pfeifer did not receive any of the sale proceeds, as he had not received any distributions from the Partnership from 2000 to 2012. *Id*. at ¶ 60. According to a document entitled "Disposition of Sales Proceeds" attached as Exhibit 4 to the Complaint, the $12.5 million sales proceeds from the Property was distributed in the following fashion: (1) $1,129,523 to pay off the First Mortgage, (2) $48,734.70 as a credit to the buyer for the security deposit, (3) $50,000 for a broker's fee, (4) $66,798.30 for prorated real estate taxes, (5) $52,063.60 as a credit to the buyer for prorated rents, (6) $56,250 for city/county taxes, (7) $75,000 for state taxes, (8) $28 for wire transfer fees, (9) $10,000 for a utility deposit escrow, (10) $100,000 to the cash-on-hand account of 9000 Centre Management Corp., (11) $1,648,798.31 as repayment of "Partner Loans/Interest," (12) $500,000 for a "Special Payment" to Cronin, (13) $750,000 for a "Contingency Reserve," (14) $410,640.21 to Ginsberg as a payment "per agreement," (15) $8,721,842.21 for "Payment of principal/interest/fees to holder of "wrap" notes." *Id.* at Exh. 4. After totaling up these amounts, the exhibit reflects a deficit of $919,678.33—which is greater than the $910,640.21 in payments made to Cronin and Ginsberg—allegedly leaving no amount available for distribution to the Limited Partners.

Pfeifer alleges that his projected tax liability for the sale is $468,159 based on his 29.7% interest in the Property. *Id*. at ¶ 77.

## Discussion

*Legal Standard*

A motion to dismiss for failure to state a claim under F.R. Civ. P. 12(b)(6), made applicable by Bankruptcy Rule 7012(b), is "designed to test the legal sufficiency of the

---

[5] Pfeifer alleges that Defendants withheld material information about the Property and the Partnership from Pfeifer throughout the entire period. *Id.* at ¶¶ 54, 55, 56, 57, 58.

6

complaint, and thus does not require the Court to examine the evidence at issue." *DeJesus v. Sears, Roebuck Co.,* 87 F.3d 65, 69 (2d Cir. 1996), *cert. denied*, 519 U.S. 1007 (1996); *see also Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984). In deciding a Rule 12(b)(6) challenge, "a court must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009). For a plaintiff to prevail on a motion to dismiss, the factual allegations must "plausibly suggest an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678, citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Defendants have moved to dismiss the Complaint on statute of limitations grounds. "Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss. Such a motion is properly treated as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon relief can be granted. . . ." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) (citations omitted). "Such a motion is well-grounded if it appears on the face of the complaint that the cause of action has not been brought within the statute of limitations." *Santos v. Dist. Council of New York City and Vicinity of United Bhd. of Carpenters & Joiners of Am., AFL-CIO*, 619 F.2d 963, 967 n.4 (2d Cir. 1980) (citations omitted).

7

*The Claims at Issue*

The Complaint asserts claims for breach of fiduciary duty (Counts I and II), conversion (Count III), and breach of contract (Count IV). The fiduciary duty claims assert that the Defendants engaged in self-dealing by (i) participating in the 1999 refinancing and the payments to Ginsberg to obtain his interest in the Senior Note and his agreement to step down as General Partner, (ii) failing to provide Pfeifer with material information relating to the management and sale of the Property, (iii) executing a "phony" $550,000 promissory note, (iv) improperly distributing the sale proceeds, and (v) making "special payments" from the sale proceeds to Cronin and Ginsberg. The claim for conversion alleges that the Defendants used Pfeifer's share of the sale proceeds to make distributions to themselves. The breach of contract claim asserts that Defendants breached the partnership agreement by (i) engaging in a capital contribution scheme, (ii) altering Pfeifer's right to distributions without Pfeifer's consent, and (iii) refusing to provide Pfeifer with an accounting of the Partnership's finances and transactions.

*The Record on this Motion*

Before reaching the merits of the pending motion, it is necessary to address the scope of the record that can be considered on this motion to dismiss. Defendants have submitted in support of their motion numerous memoranda sent to the Limited Partners by Cronin as well as correspondence among Cronin, Pfeifer, and various third-party professionals. On a motion to dismiss under Rule 12(b)(6), a court may consider "any written instrument attached to [the complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sira v. Morton*, 280 F.3d 57, 67 (2d Cir. 2004). For the latter category of documents—those "integral" to the complaint—there must be no dispute regarding the documents' authenticity or accuracy. *Faulker v. Beer*, 463 F.3d

8

130, 134 (2d Cir. 2006). On this motion, Defendants assert that the Court can consider (i) the memoranda from 1997 to 1999 as incorporated by reference in the Complaint and (ii) the 2005 correspondence among Pfeifer, Cronin, and Pfeifer's advisors, on the ground that a complaint is also deemed to include "documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).

Defendants stretch the latter doctrine when they assert that the early (1997–1999) memoranda were incorporated by reference into the Complaint. The Complaint makes two references to the memoranda: first, "In a series of memoranda to the Limited Partners, beginning in late 1997 and progressing through early 1999, Cronin proposed to the Partnership a mortgage refinancing scheme to the Partnership," Compl. at ¶ 32; and second, "Cronin, in a written memorandum to certain of the Limited Partners, characterized the 1999 investment by each Limited Partner as a 'capital call.'" *Id.* at ¶ 38. The Complaint does not reference the memoranda aside from this vague and cursory language. As explained by the Second Circuit: "Limited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Morton*, 280 F.3d at 67.

In any event, the 2005 correspondence, which is far more critical to Defendants' case, was not incorporated into the Complaint. Even if the 2005 correspondence is "integral" to the Complaint—and it does not appear that the correspondence relates to Pfeifer's ability to make out a *prima facie* case rather than the defense—Pfeifer has asserted that the documents relied on by the Defendants do not provide the Court with an accurate depiction of the communications. Additionally, the proposition cited by the Defendants—that a court can consider documents

9

relied upon by a plaintiff in bringing suit—is inapposite. Defendants' cite two cases in support of that argument: *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 731 (Bankr. S.D.N.Y. 2008), and *Robles v. Copstat Security, Inc.*, No. 08 Civ. 9572 (SAS), 2009 WL 1867948, *2 (S.D.N.Y. June 29, 2009). Both of those cases in turn rely on *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). In *ATSI*, the Second Circuit, apparently without objection, considered written agreements between the parties, including a registration rights agreement and a securities purchase agreement, to uphold the dismissal of securities fraud claims. While it may be appropriate for a court to consider a contract appended to a complaint or one that directly impacts the *prima facie* case, *ATSI* does not hold that *any* documents reviewed by a plaintiff before deciding to file suit are fair game for consideration at the motion to dismiss stage. Here, there is no indication that Pfeifer necessarily relied on the 2005 correspondence in drafting the Complaint because it does not appear to affect his ability to frame a *prima facie* case. It obviously impacts the Defendants' ability to assert the statute of limitations as an affirmative defense, but the documents fall outside the scope of what may be considered at the motion to dismiss stage.

Thus, as further discussed below, the Court will exclude the correspondence offered by Defendants in deciding the motion to dismiss. Based thereon, the Court finds that the count of the Complaint based on breach of contract is for the most part untimely based exclusively on the record relied on by Pfeifer in the Complaint. Accordingly, Count IV is dismissed in part only. As to the remaining claims in Count IV and in Counts I, II and III, Pfeifer must have an opportunity to respond to what in effect is Defendants' summary judgment motion. *See Garanti Finansal Kiralama A.S. v. Aqua Marine and Trading Inc.*, 697 F.3d 59, 64 (2d Cir. 2012), citing *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2011) (per curiam). Accordingly, the Court will

10

convert this motion to dismiss into one for summary judgment and give the parties an opportunity to present all relevant material. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."). The parties should also be accorded a reasonable opportunity for discovery if they want it.

*Breach of Contract Claim*

The breach of contract claim is governed by a six-year statute of limitations. See N.Y. CPLR 213(2).[6] Under New York law, in a contract action, the statute of limitations begins to run "from the time of the breach though no damage occurs until later," *Ely-Cruikshank Co., Inc. v. Bank of Montreal*, 81 N.Y.2d 399, 402, 599 N.Y.S.2d 501, 502, 615 N.E.2d 985, 986 (1993). Even where the breach and alleged damages are not simultaneous, the claim still accrues at the time of the breach. *T&N PLC v. Fred S. James & Co. of N.Y., Inc.*, 29 F.3d 57, 60 (2d Cir. 1994). Moreover, even if the full extent of damages may not be known at the time of the breach, a party can still seek nominal damages in a breach of contract action. *Id.* Indeed, "[t]he plaintiff need not be aware of the breach or wrong to start the period running." *Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007).

The Complaint alleges most of the contractual breaches occurred at the time of the 1999 transactions, well over six years ago. While Pfeifer may not have suffered his most substantial losses until the 2012 sale of the Property, he was well aware that the Defendants through Property Corp. had purchased interests in the Senior and Junior Notes via the 1999 transactions, and that they had obtained a right to priority in distributions from any sale of the Property.

---

[6] There is no dispute that New York law is governing.

11

Moreover, as he alleges, after 1999 he no longer received any Partnership distributions and was subordinated to the interest of the other partners.

Pfeifer argues that the statute of limitations should run from the 2012 sale because the Defendants had a "continuing contractual obligation" "to share equally in corporate opportunities, investments, and businesses." Opp. at p. 18, citing *Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 260-61 (S.D.N.Y. 2008) and *Guilbert v. Gardner*, 480 F.2d 140, 150 (2d Cir. 2007). The cases cited by Pfeifer are inapposite. In *Guilbert*, the defendants were required to contribute a certain amount each year to the plaintiff's pension fund. In *Kermanshah*, the defendants forged the plaintiff's name on transfer documents, failed to include the plaintiff in newly formed businesses and purchased properties, and provided the plaintiff with "sham payments," all within the six-year statute of limitations. *Kermanshah*, 580 F. Supp. 2d at 260.

Pfeifer asserts in a footnote that "the Partnership Agreement afforded Mr. Pfeifer continuing and separate benefits each year," Opp. at 18 n.4, but for the most part he does not identify contract provisions that were allegedly breached within the six-year statute of limitations period. For example, the Complaint cites §§ 2.5, 7.5, 17.3, and 20.6 of the Partnership agreement, but none of these sections can be considered the source of a contractual breach. Section 2.5 contains language that prohibits requiring any partner to contribute additional funds to the Partnership. Section 7.5 precludes the General Partner from creating any additional interests in the Partnership (except as provided for in the Partnership Agreement) or from accepting any capital contributions that would affect the rights of the other partners with respect to allocations or distributions. Section 17.3 similarly forbids the General Partner—among other things—from executing a document that would affect the rights of the Limited Partners without the consent of all of the Limited Partners. Section 20.6 provides that the Partnership agreement

may not be amended without the consent of the General Partner and a majority in interest of the Limited Partners. The Complaint does not explain how any of these provisions was breached. In any event, even if (as Pfeifer asserts) the demand for a $550,000 investment was an improper "capital call"—and not (as Defendants assert) an invitation to make an investment—it took place in 1999.

Notwithstanding the above, the Complaint contains two allegations that survive the motion to dismiss. First, the Complaint, somewhat conclusorily, asserts that the Defendants "continued to breach the Partnership Agreement and ultimately injured Mr. Pfeifer in late 2012 when they distributed the Property sale proceeds to the Limited Partners, except Mr. Pfeifer, pursuant to their capital contribution scheme." Compl. at ¶ 104. The Complaint also alleges that the Defendants "breached Section 6.3 of the Partnership Agreement through their repeated refusal to provide Mr. Pfeifer with contractually required accountings of the Partnership's finances and transactional conduct." *Id.*[7] The Complaint does not identify any specific contractual provision that was breached in 2012 and does not state when the Defendants refused to provide information. Nevertheless, § 6.3 of the Partnership agreement—attached as Exhibit 1 to the Complaint—does provide for annual accounting.[8] Therefore, it is possible that there was a failure to provide a financial statement within the past six years. It is also possible that the 2012 distribution violated the Agreement because an accounting of the final distribution has never been provided. Since it is not clear from the face of the Complaint that these claims would be

---

[7] The Court notes but does not rely on the letters provided by the Defendants which appear to show that Cronin and the Partnership's accountant provided Pfeifer with substantial information about the 1999 transactions by 2005, at the latest.

[8] Section 6.3 of the Partnership Agreement provides:

> The Managing General Partner shall cause financial statements of the Partnership to be reviewed and reported on by the Partnership's Accountants at appropriate intervals, not less frequently than annually. . . . The General Partner shall promptly transmit to each of the Limited Partners a copy of all such financial statements and reports.

13

time-barred, the Court will dismiss certain of the contract claims and convert the Defendants' motion to one for summary judgment on the surviving claims. Count IV of the Complaint is thus dismissed in part on statute of limitations grounds.

*Conversion Claim*

It is not readily apparent from the face of the Complaint that the claim for conversion is time-barred. Such a claim accrues when a defendant refuses to return property after a demand or when a defendant disposes of plaintiff's property, whichever comes first. *Malanga v. Chamberlain*, 71 A.D.3d 644, 896 N.Y.S.2d 385 (2d Dept. 2010). The Complaint alleges in effect that the Defendants converted Pfeifer's interest in the proceeds from the sale of the Property, and that the wrongful act took place when the Property was sold in 2012, well within the three-year statute of limitations.

Admittedly, the conversion claim as stated is largely duplicative of the breach of contract claim. To determine "whether a conversion claim is duplicative of a breach of contract claim, courts look to both the material facts upon which each claim is based and to the alleged injuries for which damages are sought." *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 204 (S.D.N.Y. 2011). Here, however, the conversion claim is broader than the claim for breach of contract, and there are questions regarding the 2012 distribution that are not resolved on the instant record. Pfeifer should also have the right to conduct discovery on these issues, if he wants it.

*Breach of Fiduciary Duty Claims*

The applicable statute of limitations for the breach of fiduciary duty claims is three years. *See* N.Y. CPLR 214(4); *see also IDT Corp. v. Morgan Stanley Dean Witter & Co.*¸ 12 N.Y.3d 132, 139, 907 N.E.2d 268, 272, 879 N.Y.S.2d 355, 359 (2009). According to Pfeifer, the breach

of fiduciary duty claims accrued only in October 2012 because (i) he did not incur damages until the Property was sold and the distribution of proceeds was made in 2012; and (ii) he had no prior knowledge of how the distributions would be made.

Under New York law, a tort claim—such as for breach of fiduciary duty—"accrues as soon as 'the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint" and "damages are sustained." *IDT Corp.*, 12 N.Y.3d at 140, quoting *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 612 N.E.2d 289, 292, 595 N.Y.S.2d 931, 934 (1993). The parties dispute whether damages accrued when the sale proceeds were distributed in 2012 or when the transactions occurred in 1999. Pfeifer argues that the damages were not sustained and could not be identified until the distributions actually took place, while Defendants assert that Pfeifer could have alleged damages as soon as he received notice of the 1999 transactions. They argue that even if Pfeifer did not know the full extent of his damages in 1999—as the Property had not yet been sold—"a cause of action for breach of fiduciary duty . . . acrrue[s] at the time of the alleged wrongful conduct." *In re Picillo*, 19 A.D.3d 1087, 1088-89, 797 N.Y.S.2d 236, 237 (4th Dept. 2005). They cite, for example, *Cator v. Bauman*, 39 A.D.3d 1263, 1263, 833 N.Y.S.2d 811, 812 (4th Dept. 2007), where the plaintiff purchased an annuity on the advice of the defendant in 1999, suffered losses from the sale of the annuity in 2003, and commenced suit in 2005. The *Cator* court held that the fiduciary duty claim was time-barred because the purported acts or omissions of the defendant took place before the 2003 sale. *Id.* Defendants allege that the transactions that allegedly constituted fiduciary breaches occurred in 1999, not later, and it was these transactions that established that Pfeifer would not receive any future distribution from a sale of the Property. Nevertheless, there are too many unresolved

15

issues to decide the statute of limitations motion on the instant motion to dismiss. As one example, the record contains insufficient information on the basis for the 2012 distribution.

Defendants' motion cannot be decided as a motion to dismiss but will be converted into a motion for summary judgment.

## Conclusion

For the reasons set forth above, Defendants' motion to dismiss is granted in part regarding the claim for breach of contract.  The motion to dismiss is otherwise converted into a motion for summary judgment on the statute of limitations defense. The parties are directed to meet and confer on a reasonable schedule for such a motion. Defendants may supplement the record, if they are so inclined, and they must provide a Statement of Material Facts Not in Dispute pursuant to Local Rule 7056-1. Plaintiff may then respond, and the Defendants may reply. Both parties should also have an opportunity for discovery, if they desire it. If the parties cannot agree on a scheduling order, either side may settle an order on five days' notice.

**IT IS SO ORDERED.**

Dated:   New York, New York
         October 23, 2013

                                             **s/Allan L. Gropper**
                                             UNITED STATES BANKRUPTCY JUDGE